## THE GUILDHALL.

### PETERSON et al. v. SCHULZE–BERGE et al.

(Circuit Court of Appeals, Second Circuit. December 3, 1894.)

#### No. 14.

BILL OF LADING—EXEMPTION FROM LIABILITY— PERSONAL NEGLIGENCE.

Claimants' steamship was in collision, off the English coast, with another vessel, and proceeded to London for repairs, which were made under the supervision of her owners. While making repairs it was found that part of the cargo in the fore-hold had been damaged by the shock of the collision, and required reconditioning. No examination of cargo in the after-hold was made, but the steamship proceeded on her voyage across the Atlantic. The packages of a part of the cargo in the after-hold were so damaged by the collision that their contents were lost during the voyage across the Atlantic. *Held,* that the owners, having had charge of the repairs, were personally negligent in failing to examine the cargo in the after-hold while making the repairs, and were liable for its loss, notwithstanding a clause in the bill of lading exempting them from liability for neglect of their servants, collision, and other dangers, but saying nothing about personal negligence.

Appeal from the District Court of the United States for the Southern District of New York.

This was a libel by Paul Schulze-Berge and others against the steamship Guildhall (Peterson, Tate & Co., claimants) for damages to a part of the cargo of the steamship, consigned to libelants. The district court rendered a decree for the libelants for $961.21. 58 Fed. 796. Claimants appeal.

J. Parker Kirlin, for appellants.
Wilhelmus Mynderse, for appellees.

Before WALLACE, LACOMBE, and SHIPMAN, Circuit Judges.

LACOMBE, Circuit Judge. The libelants are consignees of 250 barrels of alizarine, shipped from Rotterdam by the Guildhall. The shipment was stowed in the between-decks of No. 4 hatch, which was one of the after-hatches of the vessel, and came within 18 inches of the upper deck. Some 20 or 30 bales of straw were stowed on top of them. The Guildhall was a British steamship, hailing from Sunderland, England. She sailed from Rotterdam, October 15, 1892, with a miscellaneous cargo, bound on a voyage to New York. At about 5 a. m. of October 16th she was in collision with the English steamer Mira, about four miles to the westward of Dungeness. The claimants concede that the Guildhall was in fault for the collision. Her captain had joined the vessel at Sunderland, before she sailed thence to Rotterdam, and from that day until he fell overboard, on October 17th, and was drowned, he was, except for a few hours, continuously intoxicated. The Guildhall was damaged about the bow, so that her fore peak filled with water, and she put into London, October 17th, for repairs. It was found possible to effect these without going into dry dock, by discharging about half the cargo in the No. 1 and No. 2 holds, so that the bow rose out of water. It was

then found that, besides damage by water, some of the cargo thus discharged was damaged by the shock of the collision. It was reconditioned and reshipped. The Guildhall arrived in New York November 23d, after a very tempestuous voyage. The casks containing the alizarine were strong and heavy, bound with iron bands. Upon discharging the shipment in New York, nine of the casks were found damaged. Two of them had lost their heads, or portions of their heads, and the contents of those two were entirely lost. Seven of them had their chine hoops shoved on the head, and, the casks thus becoming loose by reason of the staves starting, most of their contents had gradually dripped or leaked out. The evidence as to the condition of the nine casks leaves no doubt in our minds that the shock of the collision caused a shifting of that part of the cargo fore and aft. Cargo stowed in the between-decks, as both the chief mate and the second mate testified, was more liable to damage by shock than that in the lower hold, the greater part of the shock being on the upper part of the ship. In consequence of this shifting, these casks "telescoped," heads were cracked or broken, and hoops were started; but the actual loss of alizarine occurred mainly by gradual subsequent leakage, not during the 24 hours from Dungeness to London, but in the voyage across the Atlantic, when the tempestuous weather produced an unusual amount of pitching and rolling. There is nothing to show any insufficiency in packing or in strength of packages.

The bill of lading under which the cargo was carried contained the following exceptions:

"The act of God, * * * loss or damage resulting from any of the following causes or perils, namely, viz.: Insufficiency in packing, or in strength of packages, * * * of breakage, * * * neglect, * * * default or error in judgment of the master, mariners, engineers, or others in the service of the owners, * * * collision, * * * perils of the seas, rivers, navigation, or otherwise, of whatsoever nature or kind, and howsoever caused. * * * The rights of parties in relation to the carriage and delivery of the said goods and otherwise under the bill of lading shall be governed by English law, except that general average shall be adjusted according to York-Antwerp Rules, 1890."

The claimants contend that this clause in the bill of lading relieves them from liability for the loss of the alizarine. It is not necessary to enter into a discussion of the questions of law, which have been argued at great length, as to the validity of such a stipulation, inserted by a common carrier in a bill of lading, when the carrier undertakes to deliver the cargo safely here, and the stipulation is valid in the country in which it is made, and in that to which the ship belongs. It is not contended that it exempts the carrier from his personal negligence. In the case at bar it is expressly admitted by formal stipulation that "the steamer was repaired and dispatched from London under the supervision of her owners." Had the damage to the vessel been external only, and such as could be repaired without discharging cargo, it might fairly be contended that there was no negligence in the failure to remove the hatches and examine into the condition of the cargo, in order to see whether some unexpected damage had resulted from the collision. With the Guildhall, how-

ever, when cargo was removed from the two forward holds in order to effect the repairs to the hull, it was found that the collision had caused damage to several of the packages contained therein of such a character that, although slight then, it would in all probability become serious if the voyage was further prosecuted without reconditioning the packages. When such a result of the collision, although unanticipated, was brought directly home to the knowledge of the owners, they must be held negligent for not inspecting, even by such examination as could be given without breaking bulk, the packages in the after-hold, which were stowed in the between-decks, a place which the evidence shows was sensitive to the shock of a collision. The proof shows that such an examination as could be secured by removing the hatch and some 20 or 30 bales of straw would have shown that some of these 9 casks of alizarine were so damaged by shifting or telescoping as to require reconditioning before proceeding on the voyage. And the breaking out of these casks for that purpose would no doubt have revealed the condition of the others. As the bulk of the damage was caused by this failure to recondition, and the neglect so to do occurred when the vessel was under the supervision of her owners, we concur with the district judge in the conclusion that the exemptions are insufficient to absolve them, even if treated as valid, and applied according to English law. The decree of the district court is affirmed, with interest and costs.