592 F.2d 138
 PPG INDUSTRIES, INC., a Pennsylvania Corporation
v.
ASHLAND OIL COMPANY-THOMAS PETROLEUM TRANSIT DIVISION, a
Kentucky Corporation
v.
CANAL BARGE COMPANY, INC. and Inland River Transportation
Corporation, acorporation, and Dravo Corporation,
Canal Barge Company, Inc., Appellant.
 No. 78-1027.
 United States Court of Appeals, Third Circuit.
 Argued Sept. 28, 1978.
Decided Dec. 29, 1978.
 
 Robert B. Acomb, Jr., Jones, Walker, Waechter, Poitevant, Carrere & Denegre, New Orleans, La., Theodore O. Struk, James R. Miller, Dickie, McCamey & Chilcote, Pittsburgh, Pa., for appellee, Ashland Oil Company-Thomas Petroleum Division.
 Donald L. Very, Tucker, Arensberg, Very & Ferguson, Pittsburgh, Pa., for appellant.
 Joseph W. Conway, Conway, Meyer & Barrante, Pittsburgh, Pa., John A. Pillar, Pittsburgh, Pa., for appellee, PPG Industries, Inc.
 Before ROSENN and WEIS, Circuit Judges and FISHER, District Judge.*
 OPINION OF THE COURT
 WEIS, Circuit Judge.
 
 
 1
 Damage to cargo transported by water has been a subject of litigation since the dawn of nautical history, yet the legal problems engendered by this activity continue to perplex the courts. In this case, the carrier contends that once it established lack of responsibility for damage done to a barge's hull as it struck a submerged object, the burden of proving negligence causing cargo damage shifted to the plaintiff shipper. The trial judge, however, charged the jury that the burden remained with the carrier to show due diligence in caring for the cargo after the incident. The district court also held that a clause in the towing contract requiring the shipper to secure insurance on the cargo with a waiver of subrogation against the carrier was exculpatory and unenforceable. And finally, since double-skinned barges were not in general use on the rivers, the trial judge ruled that a single-skinned barge used for carrying a water soluble cargo was not unseaworthy per se and withdrew that issue from the jury. Finding no reversible error in the district court's rulings, we affirm.
 
 
 2
 On March 2, 1971, Ashland agreed to transport a cargo of antifreeze owned by PPG Industries, Inc. from Beaumont, Texas to St. Paul, Minnesota. Canal Barge Company later entered into a separate towing contract with Ashland, agreeing to tow the barges containing antifreeze from Baton Rouge, Louisiana to St. Paul. Upon delivery in St. Paul, the antifreeze in one of Ashland's barges was found to be contaminated by river water.
 
 
 3
 PPG brought suit against both Ashland and Canal. In early stages of the litigation, it was determined that because of the incorporation of the Carriage of Goods by Sea Act (COGSA), 46 U.S.C. §§ 1300-1315, in the PPG-Ashland contract, the limitation period had run before suit was commenced. Judgment was accordingly entered in Ashland's favor against PPG. The claim for cargo loss asserted against Canal, however, continued to be viable as were the cross-claims between Ashland and Canal. PPG Industries, Inc. v. Ashland Oil Co.-Thomas Petroleum Transit Division, 527 F.2d 502, 505-07 (3d Cir. 1975).
 
 
 4
 On remand, the case proceeded to trial in the district court[1] before a jury which found a general verdict in favor of Canal, but by special interrogatories determined that Canal was negligent and that the cargo loss was $110,000. Ashland's claim for damages to its barge was denied. The district court entered judgment n.o.v. in favor of PPG for the cargo loss and added interest.
 
 
 5
 The evidence established that about four days before arrival at St. Paul an accident occurred near Lock 14 on the Mississippi River and the Ashland barge was damaged. While maneuvering before entering the lock, the barges and towboat unexpectedly turned around in the river, a movement called "topping." As they did so, at least one barge scraped the river bottom or hit some submerged object. Inspection of the Ashland barge hull after it reached St. Paul and had been taken to dry dock revealed three holes more than one inch wide and a number of cracks varying in size from a fracture line to one-quarter inch in width. None of this damage could be seen while the barge was in the water.
 
 
 6
 Members of the crew testified that after the topping incident and during the remaining days of the voyage routine external checks did not disclose any signs that the Ashland barge was taking on water. No steps were taken, however, to examine the cargo or have the hull thoroughly inspected. At St. Paul, it was discovered that water had entered some of the barge compartments and contaminated the antifreeze, a highly soluble substance.
 
 
 7
 The trial judge removed from the jury's consideration Canal's contention that the barge was unseaworthy because a double-skinned vessel should have been used to carry cargo of this nature. The district court also decided that a provision in the PPG contract with Ashland requiring that the cargo owner purchase insurance for its own account with waiver of subrogation to the carrier did not relieve Canal of liability for the loss.
 
 
 8
 The case was submitted to the jury on instructions that upon proof the cargo was in good condition at the voyage's beginning, and was delivered at its end in damaged condition, a prima facie case for PPG was established. The jury was further charged that the burden shifted to Canal to establish due diligence and care for the cargo, but if it were shown that the loss was caused by a peril of the sea, then PPG would not be entitled to recover. The jury was told to submit a general verdict.
 
 
 9
 During their deliberations, the jurors sent a note to the trial judge reading:
 
 
 10
 "If in our deliberations we consider that the damage to the barge took place during the topping at Lock 14 and that no negligence existed on the part of the captain and pilot of the Caroline (Canal tug), must we at that point stop any further deliberation, or can we consider what is believed to be negligence on the part of the parties involved following the topping?"
 
 
 11
 After consultation with counsel, the trial judge instructed the jurors in substance that if they found Canal was not at fault for the topping, they should stop at that point. However, in addition, the judge asked that certain interrogatories be answered. In general they asked, assuming Canal had shown due diligence up to and including the topping incident, what part of the cargo damage took place as a result of the topping; what portion occurred from the failure of due care thereafter; which parties failed to exercise due care; and what was the amount of damage.[2]
 
 
 12
 The jury returned a general verdict in favor of Canal, but in answer to the interrogatories, found that Canal failed to exercise due care after the topping. According to the jury's responses, none of the cargo damage resulted from the topping, but rather flowed from failure to exercise due care thereafter. After consideration of post-trial motions, the district court entered judgment n.o.v. in the amount of $110,000 against Canal.
 
 I.
 BURDEN OF PROOF
 
 13
 Canal contends that in submitting the interrogatories to the jury, the trial judge erred in allocating the burden of proof. Canal's position is that if it met the burden of proving a peril of the sea, then PPG was required to prove that negligence of the carrier caused the cargo damage. The judge did not accept this argument. In connection with the interrogatories, he delivered these instructions:
 
 
 14
 "So what I am asking you to do is that, if you are satisfied that Canal met its burden by a fair preponderance of the evidence that it exercised due care and diligence up to the time of the topping, and if you are satisfied that Canal has met its burden of showing by that standard that the topping itself was not due to the lack of due care or diligence, but to the peril of the sea, if you will, or whatever, then you decide that Canal didn't establish to your satisfaction that it exercised due care and diligence during the rest of the trip, I think there were four days beyond the topping incident, and if you decide they didn't establish that to your satisfaction, then I want to know what percentage of the damage to the contamination to the cargo occurred as a result of the topping itself and what percentage occurred as a result of the failure to exercise diligence and due care after the topping."
 
 
 15
 The towing contract required Canal to exercise due diligence in the handling, care and delivery of the cargo but reserved for the carrier the limitation of liability granted under § 3 of the Harter Act, 46 U.S.C. § 192.[3] Section 3 would relieve Canal from liability if the loss was caused by a peril of the sea.[4]
 
 
 16
 The jury verdict established that the damage to the barge was caused by the topping incident. Cargo loss, however, was another matter. The jury apparently believed that the damage to the hull was not so extensive as to be the sole and proximate cause of the contamination and that the subsequent neglect of the carrier was the immediate cause. In granting judgment n.o.v. to the cargo owner, the trial judge necessarily implied that there was adequate evidence to support the jury's conclusion.
 
 
 17
 Where damage to the cargo is not discovered until after it has been delivered and no substantial evidence of the cause remains, allocation of the burden of proof and attendant risk of nonpersuasion in proving that the loss arose from a cause excepted under law or by the parties is often crucial in determining liability. Our task here is to determine whether the judge's charge properly directed the jury on this issue. Since the exculpatory provisions of the Harter Act were incorporated into the towing contract by reference, the decisional law regarding burden of proof under that Act and COGSA,[5] is pertinent to our review.
 
 
 18
 A seminal case in the United States, a pre-Harter Act decision,[6] is Clark v. Barnwell, 53 U.S. 272, 13 L.Ed. 985 (1851), in which there was a claim for damaged goods shipped under a bill of lading that excepted liability for "all, and every the dangers and accidents of the seas and navigation . . . ." Id. at 280. The Court explained that upon a showing that there had been delivery of goods in damaged condition, the burden was on the carrier to show that the loss was caused by an excepted peril. Once that was established, the shipper was required to prove that the damage could have been avoided by the exercise of reasonable skill and attention by the carrier. "But in this stage and posture of the case, the burden is upon the plaintiff to establish the negligence as the affirmative lies upon him." Id. The Court then quoted from the charge of Lord Chief Justice Denman in Muddle v. Stride, 9 Car. & Payne 380:
 
 
 19
 "(I)f on the whole, it be left in doubt what the cause of injury was, or, if it may as well be attributable to 'perils of the sea' as to negligence, the plaintiff cannot recover."
 
 
 20
 This latter reference must be considered to have been modified by The Folmina, 212 U.S. 354, 29 S.Ct. 363, 53 L.Ed. 546 (1909). In that case cargo was damaged by sea water, and the Court said, "while there was a certainty from the proof of a damage by sea water, there was a failure of the proof to determine whether the presence of the sea water in the ship was occasioned by an accident of the sea, by negligence, or by any other cause." Id. at 363, 29 S.Ct. at 365. The Court held that the carrier had failed to meet its burden and accordingly, was liable. See also Commercial Corp. v. New York Tank Barge Corp., 314 U.S. 104, 108-09, 62 S.Ct. 156, 86 L.Ed. 89 (1941). Moreover, as the court explained in Lekas & Drivas, Inc. v. Goulandris, 306 F.2d 426, 431 (2d Cir. 1962): "The respondents in Clark v. Barnwell had not only established a peril of the sea as a cause but had negated all others."
 
 
 21
 Since the carrier, and not the shipper, usually has the means of knowing most about the events of the voyage, it is sound to place on the ship owner both the burden of showing the inclusion of loss within an exception and proving the exercise of due diligence to prevent harm to the cargo. Application of the general rule at times appears inconsistent because of the varying factual circumstances leading to cargo loss and the diverse exemptions sought to be invoked. Two patterns discernible from case law and pertinent to our analysis here surface.
 
 
 22
 The first is where the cargo is damaged by forces completely unrelated to its inherent nature. For example, a cargo of steel is lost because the ship sinks. In this situation, inquiry focuses upon the cause of injury to the vessel, not the cargo. The damage claim, therefore, centers on cause and to avoid responsibility the carrier must prove that the damage to the cargo stemmed from an exempted occurrence, such as a danger of the sea. The burden rests upon the carrier to show that the cargo damage resulted from the excepted peril, and the exercise of due diligence to avoid the damage caused by the described hazard. E.g., States Marine Corp. v. Producers Cooperative Packing Co., 310 F.2d 206 (9th Cir. 1962); Tri-Valley Packing Ass'n v. States Marine Corp., 310 F.2d 891 (9th Cir. 1962); Schroeder Bros. v. The Saturnia, 226 F.2d 147 (2d Cir. 1955).
 
 
 23
 Second is that where the nature of the injury to the cargo indicates in and of itself inclusion within a specified exemption from liability provided by the Act or bill of lading, such as decay or rust. For example, if steel cargo is delivered in rusty condition and the bill of lading exempts the carrier from liability for rust, the burden is on the cargo owner to establish negligence as a cause once the carrier shows that the nature of the damage brings it within the exception. In order to recover, the cargo owner must carry the burden of proving the carrier's negligence brought about the damage. If the cause of injury is left in doubt, the carrier stands excused since by virtue of the exemption the shipper accepted the risk of loss of that kind. There is nothing additional the carrier need prove to place the loss within the clause which exempted liability the nature of the injury speaks for itself. See, e.g., The Monte Iciar, 167 F.2d 334 (3d Cir. 1948). As the Supreme Court said in The Folmina, supra at 362, 29 S.Ct. at 365:
 
 
 24
 "Of course, where goods are delivered in a damaged condition, plainly caused by breakage, rust, or decay, their condition brings them within an exception exempting from that character of loss, as the very fact of the nature of the injury shows the damage to be Prima facie within the exception, and hence the burden is upon the shipper to establish that the goods are removed from its operation because of the negligence of the carrier."
 
 
 25
 See generally The Patria, 132 F. 971 (2d Cir. 1904); A. Knauth, The American Law of Ocean Bills of Lading 193-96 (4th ed. 1953); Comment, Cargo Damage at Sea: The Ship's Liability, 27 Tex. L. Rev. 525 (1947).
 
 
 26
 The case Sub judice falls into the first category. Canal's defense is that the damage was caused by a defect in navigation or peril of the sea exception under the Harter Act. We look therefore to cause, not result, and the carrier must meet its burden of persuasion that the cause of the damage fell within the exception.
 
 
 27
 The way in which the issue is posed often determines the outcome of the case. Here, the issue could be framed as whether the failure to mitigate damages to the cargo was a separate act of negligence which the plaintiff was required to prove; or, alternatively, whether the carrier fully discharged its obligation to meet the plaintiff's prima facie case by showing that a peril of the sea caused some hull damage during the voyage.
 
 
 28
 Case law provides no reliable chart. In G. Gilmore & C. Black, The Law of Admiralty 170 (2d ed. 1975), the authors characterize the failure to use due care in preventing the spread of mischief as negligence. Moreover, they reject the proposition that the mere happening of damage through an excepted peril releases the carrier from responsibility to take due measures for proper cargo care thereafter.
 
 
 29
 The jury's findings established that the carrier met the plaintiff's prima facie case up to and including the topping incident, and the defendant would have been exonerated if the matter had ended at that point. It did not, however, since the jury found that thereafter the carrier failed to exercise due diligence and cargo damage resulted. This is a close case, but in our view the trial judge did not err in imposing the burden on the carrier to demonstrate its exercise of due care in caring for the cargo to the end of the voyage. Immunity conferred by the Harter Act must be strictly construed. Gilmore & Black, Supra at 156 n.50. The prima facie case of negligence which the cargo owner made out by showing damage to the cargo at destination was not completely answered by the defendant's evidence of the topping incident and its conduct for the remainder of the voyage.
 
 
 30
 Moreover, the basic policy underlying the shifting of burden to the carrier to explain damage, See Schnell v. The Vallescura, 293 U.S. 296, 307, 55 S.Ct. 194, 79 L.Ed. 373 (1934), supports imposition of the burden on Canal. The carrier knew what happened after the topping incident to the end of the voyage and was in a far better position than the shipper to present evidence of due care.
 
 
 31
 This case differs from those in which the burden shifts back to the shipper to prove that antecedent or concurrent negligence on the part of the carrier contributed in bringing about the loss. In those instances, after the carrier produces evidence of the excepted cause which brought about the damage, the shipper may go forward and show that other factors for which the ship was responsible played a part. But when the carrier's evidence does not show that the excepted cause produced all of the damage, as here, the shipper is entitled to a complete explanation. In Armco International Corp. v. Rederi A/B Disa, 151 F.2d 5, 8 (2d Cir. 1945), the court, concerned with the problem of determining whether damage occurred aboard ship or ashore, said:
 
 
 32
 "So far as there is any uncertainty as to the extent of the damage which happened while the (cargo was) on board, the ship has the burden of proof. . . . She did not, and indeed could not, prove what part was done aboard and what ashore."
 
 
 33
 Similarly, here the burden was on the carrier to prove the damage caused by the excepted hazard. "It is sufficient, if the carrier fails to show that the damage is from an excepted cause, to cast on him the further burden of showing that the damage is not due to failure properly to stow or care for the cargo during the voyage." Schnell v. The Vallescura, supra at 305, 55 S.Ct. at 196. In Schnell, because the claim was for an excepted result, the shipper initially did produce evidence of negligence in order to sustain its burden. The court there held that the carrier was liable for all the damage in view of its inability to apportion the loss between an exception and its negligence.[7]
 
 
 34
 In the case at bar, having made out a prima facie case of negligence, the plaintiff stood in as good a position as the shipper in Schnell. The burden shifted to the defendant to prove whether all or an ascertainable part of the damage was the result of an excepted cause. This allocation of respective burdens is supported by sound public policy and is consistent with the general rule permitting a cargo owner to use a prima facie case to show lack of care in delivery of the goods. We find no error in the court's charge in this respect.II.
 
 THE INSURANCE CLAUSE
 
 35
 In the transportation agreement between PPG and Ashland, the parties agreed that
 
 
 36
 "Hull and P & I insurance will be carried with a first class underwriter by Carrier (Ashland) for Carrier's account. Cargo insurance will be assumed or carried by Shipper (PPG) for his own account, with waiver of subrogation to the Carrier."
 
 
 37
 In the contract between Ashland and Canal, there was no mention of cargo insurance but only a proviso that Ashland was to carry Hull and P & I insurance. PPG did not take out cargo insurance and Canal contends that it is therefore relieved of liability. The district court ruled that even assuming Arguendo that the plaintiff was contractually bound to maintain coverage, that provision was unenforceable as a matter of public policy, citing Bisso v. Inland Waterways Corp., 349 U.S. 85, 75 S.Ct. 629, 99 L.Ed. 911 (1955), and Dixilyn Drilling Corp. v. Crescent Towing & Salvage Co., 372 U.S. 697, 83 S.Ct. 967, 10 L.Ed.2d 78 (1963).
 
 
 38
 Requiring the cargo owner to insure the goods and providing there shall be no subrogation is an effective way of insulating the carrier from liability regardless of culpability. The cargo owner can be expected to make a claim against his insurance company in anticipation of reasonably prompt payment rather than proceeding to contest the matter with the carrier. If the insurance company pays the claim, it cannot sue the carrier and, thus, the matter is at an end. As the district court acknowledged, however, such an arrangement runs afoul of Bisso and Dixilyn Drilling which bar contract provisions that shift responsibility for tower's negligence. See also Boston Metals Co. v. The Winding Gulf, 349 U.S. 122, 75 S.Ct. 649, 99 L.Ed. 933 (1955).
 
 
 39
 We are unpersuaded by cases tending to place a different focus on this issue. Although the Court of Appeals for the Fifth Circuit has treated the problem as essentially one of bargaining over which party shall pay the insurance premium, See Twenty Grand Offshore, Inc. v. West India Carriers, Inc., 492 F.2d 679 (5th Cir.), Cert. denied, 419 U.S. 836, 95 S.Ct. 63, 42 L.Ed.2d 63 (1974), and Fluor Western Inc. v. G & H Offshore Towing Co., 447 F.2d 35 (5th Cir. 1971), Cert. denied, 405 U.S. 922, 92 S.Ct. 959, 30 L.Ed.2d 793 (1972); Cf. Dow Chemical Co. v. Ashland Oil, Inc., 579 F.2d 902 (5th Cir. 1978), we are inclined to view Dixilyn Drilling, supra, as proscribing indirect as well as direct exculpation of negligence by carriers. See Dow Chemical Co. v. M/V Charles F. Detmar, Jr., 545 F.2d 1091 (7th Cir. 1976). Moreover, even if the Fifth Circuit approach were used here, it would not help Canal because it never bargained with PPG about cargo insurance, and therefore, cannot show reduction of its charges on that basis. Compare Twenty Grand Offshore Inc. v. West India Carriers, Inc., supra at 681-83.
 
 
 40
 We are also not convinced that the insurance clause in the transportation agreement extended to anyone other than Ashland. In the first appeal in this case, we found that COGSA provisions were not intended to apply to Canal and that contract references to "persons employed by carrier" extended only to individual employees of Ashland, not Canal. 527 F.2d at 506. The rationale of that opinion requires adoption of the same approach in construing the insurance clause of the transportation contract. Accordingly, we conclude that Canal is not entitled to judgment because of PPG's failure to secure cargo insurance.
 
 III.
 SEAWORTHINESS
 
 41
 Canal produced an expert who opined that the antifreeze should have been carried in a double-skinned barge and that for this cargo the single-skinned vessel used was unsuitable, and consequently, unseaworthy. The expert said that to his knowledge double-skinned barges had first been built about six years before the topping incident and were used to transport lubrication oil.
 
 
 42
 The marine superintendent for Canal testified that although it had some double-skinned barges in 1971, most of its equipment was of the single-skinned variety. He said that the Coast Guard had not issued any pertinent regulations, and at the time of the incident, custom was beginning to change in favor of using double-skinned vessels. When double-skinned barges were not available, Canal would use singleskin vessels to carry soluble cargo. The witness also stated that Canal would never furnish an unseaworthy vessel.
 
 During the trial, the district judge ruled
 
 43
 "there is nothing unseaworthy about a single skin barge so long as the single skin holds and in view of the testimony that at the time this was going on, most barges were single skinned.
 
 
 44
 Then there was another question of whether it could be a single skin on the bottom and double skin on the side. I'm not prepared to rule that a single skin barge was ipso facto unseaworthy, and I have so ruled."
 
 
 45
 Although the jury was directed to consider unseaworthiness in other aspects, the issue of whether a single-skinned barge was seaworthy was not submitted to it.
 
 
 46
 Seaworthiness is a relative term which looks to such matters as the type of vessel, character of the voyage, reasonably expectable weather, and navigational conditions. May v. Hamburg-Amerikanische Packetfahrt Aktiengesellschaft, 290 U.S. 333, 346-49, 54 S.Ct. 162, 78 L.Ed. 348 (1933) (The Isis ); J. Gerber & Co. v. S.S. Sabine Howaldt, 437 F.2d 580, 596 (2d Cir. 1971); Horn v. Cia de Navegacion Fruco, S.A., 404 F.2d 422, 431 (5th Cir. 1968), Cert. denied, 394 U.S. 943, 89 S.Ct. 1272, 22 L.Ed.2d 477 (1969). The vessel must be reasonably fit to carry the cargo she has undertaken to transport. The Silvia, 171 U.S. 462, 19 S.Ct. 7, 43 L.Ed. 241 (1898).
 
 
 47
 Generally, the issue of unseaworthiness is one of fact and is submitted to the jury. Luckenbach v. McCahan Sugar Co., 248 U.S. 139, 145, 39 S.Ct. 53, 63 L.Ed. 170 (1942); The Wildcroft, 201 U.S. 378, 387, 26 S.Ct. 467, 50 L.Ed. 794 (1906); The Carib Prince, 170 U.S. 655, 658, 18 S.Ct. 753, 42 L.Ed. 1181 (1898). Here, however, there was no dispute about the facts. Essentially, what the defendant was asserting was a new development in construction which had not come into common use in the industry. It was not such an innovation it had to be adopted by all shippers immediately, making the older barges obsolete for transporting this particular cargo. Compare The T. J. Hooper, 60 F.2d 737, 740 (2d Cir.), Cert. denied sub nom. Eastern Transportation Co. v. Northern Barge Corp., 287 U.S. 662, 53 S.Ct. 220, 77 L.Ed. 571 (1932), With Marshall v. Ove Skou Rederi A/S, 378 F.2d 193, 201 (5th Cir.), Cert. denied, 389 U.S. 828, 88 S.Ct. 86, 19 L.Ed.2d 84 (1967). Nor was it shown that scraping the barge and holding the bottom was reasonably to be expected in a voyage on the Mississippi. Under the circumstances of this case, the trial judge did not err in withdrawing the design issue from the jury.
 
 
 48
 The defendant also contends that it was error to award interest to the plaintiff. This was a matter within the discretion of the trial court and we find no abuse in its exercise.
 
 
 49
 Having carefully reviewed the case, we conclude that the district court did not commit reversible error, and accordingly, the judgment will be affirmed.
 
 
 50
 ROSENN, Circuit Judge, Dissenting.
 
 
 51
 This appeal involves the application of maritime legal principles to transportation of cargo on the Mississippi River. The focal point of the complex controversy between the shipper of the cargo, PPG Industries, Inc. ("PPG"), and the several carriers is the topping incident at Lock 14 which caused the penetration of the antifreeze-laden hull of the barge REB-1602. Because I cannot agree with the majority's rationales on the burden of proof, the enforceability of the insurance provisions, and the seaworthiness issues, I respectfully dissent.
 
 
 52
 In March of 1971, Ashland Oil Company-Thomas Petroleum Division ("Ashland") contracted to transport approximately 400,000 gallons of antifreeze, a soluble liquid, for PPG from its plant in Beaumont, Texas to St. Paul, Minnesota. The antifreeze was loaded into Ashland's barge REB-1602 and towed to Baton Rouge, Louisiana. Ashland then entered into a separate agreement with Canal Barge Company, Inc. ("Canal") obligating Canal to tow the REB-1602 to St. Paul.
 
 
 53
 During the voyage on the river, a topping incident occurred at Lock 14. The single skin barge scraped either the river bed or a submerged object causing damage to the hull of the craft. It is undisputed that during the remaining four days of the trip, the antifreeze cargo became contaminated with river water. By the time the barge had arrived in St. Paul, 131,474 gallons of antifreeze had become unsalvageable.
 
 I. BURDEN OF PROOF
 A.
 
 54
 The trial court in effect instructed the jury that Canal had the burden of proving that it acted with due diligence from the inception of its tow of the barge until the ultimate delivery of the cargo at St. Paul. Both parties and the majority agree that the general verdict shows that Canal met its burden up to the time of the topping incident by demonstrating that the damage to the barge was caused by a peril of the sea or obstruction to navigation for which there is no liability. However, the court also charged the jury that even After the topping incident Canal had the burden of proving that it exercised due diligence in transporting the cargo during the balance of the voyage. Whether this instruction was proper is significant to the outcome of this case.
 
 
 55
 The theory of liability apparently asserted by PPG was that Canal negligently failed to inspect the barge and salvage the cargo after the topping incident. (No evidence was presented to suggest that a separate, subsequent occurrence resulted in damage to the cargo.) With Canal carrying the burden of proof imposed upon it by the court, it had to establish the standard of care of a carrier in such a situation and the necessary steps it had taken to satisfy that standard. If the jury was unconvinced by Canal, then PPG would have to prove nothing in order to recover. If, however, PPG had the burden of proof, it would have to produce evidence as to what actions Canal should have taken after the topping incident in the exercise of reasonable care. PPG failed to produce evidence on this point. Thus, if the burden of proof after the topping incident shifted to PPG on this question, the judgment in its favor cannot stand.
 
 
 56
 The majority's initial formulation of the burden of proof issue is correct: once the cargo owner proves that the cargo was in good condition when loaded but contaminated when delivered, a prima facie case of liability has been made against the carrier. Where the majority and I change course, however, is after the barge was exposed to the peril of the sea. According to the majority, "(t)he burden rests upon the carrier to show that the cargo damage resulted from the excepted peril, And the exercise of due diligence to avoid the damage caused by the described hazard." Maj. op., Supra at 143 (emphasis supplied). I believe the case law does not go so far. On the contrary, it merely holds that the carrier must establish Either an excepted cause Or due diligence, but not both.[1]
 
 
 57
 The Supreme Court in Schnell v. The Vallescura, 293 U.S. 296, 55 S.Ct. 194, 79 L.Ed. 373 (1934), adopted the alternative approach. "It is sufficient, If the carrier fails to show that the damage is from an excepted cause, to cast on him the further burden of showing that the damage is not due to failure properly to stow or care for the cargo during the voyage." Id. at 305, 55 S.Ct. at 196 (emphasis supplied). Similarly, in Lekas & Drivas, Inc. v. Goulandris, 306 F.2d 426 (2d Cir. 1962), Judge Friendly said that once the shipper establishes a prima facie case, "the burden then falls upon the carrier to bring itself within an excepted cause Or to prove it exercised due diligence to avoid and prevent the harm." Id. at 429 (emphasis added). See Horn v. CIA de Navegacion Fruco, S.A., 404 F.2d 422, 435 (5th Cir. 1968), Cert. denied, 394 U.S. 943, 89 S.Ct. 1272, 22 L.Ed.2d 477 (1969).
 
 
 58
 The statutory scheme of the Carriage of Goods by Sea Act, 46 U.S.C. §§ 1300-1315 (1970) (COGSA), supports this position,[2] Section 4(2) of COGSA, 46 U.S.C. § 1304(2), establishes sixteen specific causes of damage to cargo for which a carrier by sea would not be liable. A seventeenth provision is included which excuses the carrier from liability for any other cause which was not the result of the carrier's negligence. The statutory scheme intended by Congress was to permit the carrier to prove either one of the sixteen excepted causes or the absence of negligence regardless of the cause. See G. Gilmore & C. Black, The Law of Admiralty 183-85 (2d ed. 1975).
 
 
 59
 I find the authorities cited by the majority in support of its position that the carrier must prove both an excepted cause and absence of negligence, (Producers Cooperative; Tri-Valley Packing ; and The Saturnia ) Maj. op., Supra at 143, unpersuasive. Only one of the three Tri-Valley Packing, actually endorses the dual requirement. States Marine Corp. v. Producers Cooperative Packing Co., 310 F.2d 206 (9th Cir. 1962), quoting from Schnell v. The Vallescura, supra, applies the rule in the alternative and not the conjunctive, as do the majority, and states that the carrier must " 'bring himself within the exception Or to show that he has not been negligent.' " 310 F.2d at 212 (emphasis added). In Schroeder Bros. v. The Saturnia, 226 F.2d 147 (2d Cir. 1955), the question was never considered because the carrier failed to prove either an excepted cause or the exercise of due diligence.
 
 
 60
 The court in Tri-Valley Packing Association v. States Marine Corp., 310 F.2d 891 (9th Cir. 1962), does take the position that even though the carrier proved that damage to the cargo came from an excepted cause, the burden of proof remained on the carrier to prove that it was free from negligence. The entire discussion of this issue in the opinion merely consists of this curt statement:
 
 
 61
 Appellees also contend that the burden of showing carrier negligence was on libelants. This is simply not the law. Cf. States Marine Corp. v. Producers Cooperative Packing Co., 9 Cir., 310 F.2d 206, and see Gilmore and Black, The Law of Admiralty: "The Burden of Proof" pp. 162-163.
 
 
 62
 Id. at 893 (omitted footnote quotes paragraph from Gilmore & Black).
 
 
 63
 I have already pointed out that Producers Cooperative does not support this position. Diss. op., Supra at 148. Furthermore, Gilmore and Black view the requirement of proof of due diligence as an alternative to proof of an excepted cause. "Once the damage is established, the carrier, it would seem, has two main lines of possible escape." One is proof of an excepted cause and the other is proof of freedom from fault. Gilmore & Black (2d ed.) Supra at 184-85.
 
 
 64
 Thus, once the shipper has shown that good cargo arrived in damaged condition, the carrier can rebut this prima facie case of liability by proving an excepted cause. This, however, does not necessarily relieve the carrier from liability. Proof of negligence will render a carrier liable despite a showing of an excepted peril. I do not propose that "the mere happening of damage through an excepted peril releases the carrier from responsibility to take due measures for proper cargo care thereafter." Maj. op., Supra at 144. Failure to handle cargo properly after an accident or failure to mitigate damages constitutes negligence. The burden of proving this issue, however, does not belong to the carrier and I, therefore, disagree with the majority's determination that it does.
 
 
 65
 For over a century, cases have uniformly held that once a shipper's prima facie case is rebutted by proof of an excepted cause, the burden of proving that the exercise of due care could have avoided or reduced the damage returns to the cargo owner. In 1851, the Supreme Court announced the principle that has since prevailed.
 
 
 66
 Hence it is, that, although the loss occurs by a peril of the sea, yet if it might have been avoided by skill and diligence at the time, the carrier is liable. But in this stage and posture of the case, the burden is upon the plaintiff to establish the negligence as the affirmative lies upon him.
 
 
 67
 Clark v. Barnwell, 53 U.S. 272, 280, 13 L.Ed. 985 (1851); Accord, Schnell v. The Vallescura, supra, 293 U.S. at 304-05, 55 S.Ct. 194; The Monte Iciar, 167 F.2d 334, 337 (3d Cir. 1948) (en banc); United States v. Los Angeles Soap, 83 F.2d 875, 881 (9th Cir. 1936).
 
 
 68
 This allocation of the burden of proof was also intended by the framers of COGSA: "Once a COGSA exception is established, the burden then returns to the shipper or consignee to 'show that there were . . . concurrent causes of loss in the fault and neglect of the carrier.' " Vana Trading Co. v. SS "Mette Skou", 556 F.2d 100, 105 (2d Cir.), Cert. denied, 434 U.S. 892, 98 S.Ct. 267, 54 L.Ed.2d 177 (1977); Accord, Lekas & Drivas, Inc. v. Goulandris, supra, 306 F.2d at 432; Gilmore & Black, Supra at 184.
 
 
 69
 The century-old principle is consistent with the general rule for common carriers of goods:
 
 
 70
 It is generally agreed, however, that a carrier of goods, who is an insurer against everything but a few exceptional perils, has the burden of proving that the loss or damage to the goods falls within one of the exceptions, after which it is the prevailing view that the burden is upon the plaintiff to show any negligence of the carrier responsible for the harm under such circumstances.
 
 
 71
 W. Prosser, Law of Torts 209 (4th ed. 1971) (footnotes omitted).
 
 
 72
 The majority's assertion, See Maj. op., Supra at 144, that the carrier must prove that All of the damage to the cargo was the result of an excepted peril before the burden on the negligence question will shift to the cargo owner is not the prevailing law. In a case such as this, where the shipper alleges that negligence took place after the vessel was damaged by an excepted cause, proof that all of the damage to the cargo was the result of the peril of the sea would exempt the carrier from liability and end the case. Subsequent negligence would be irrelevant because it could not have caused any damage to the cargo. Thus, the shifting burden would only be relevant in a case where the carrier succeeded in proving that at least part of the damage was the result of an excepted cause. The shipper could then prove that part of the damage was also attributable to negligence. See United States v. Los Angeles Soap, supra 83 F.2d at 882.
 
 
 73
 If the shipper proves that despite the excepted cause the carrier's negligence contributed to the damage to the cargo, then the burden of proof reverts to the carrier to apportion damages between the excepted cause and the negligence. Failure to prove the proper allocation will leave the carrier liable for the full extent of the damages. Schnell v. The Vallescura, supra 212 U.S. at 306, 55 S.Ct. 194. The case only reaches this point, however, after the shipper carries its burden of proving the carrier's negligence. See id.; Vana Trading Co. v. SS "Mette Skou", supra 556 F.2d at 106; Armco International Corp. v. Rederi A/B Disa, 151 F.2d 5 (2d Cir. 1945); United States v. Los Angeles Soap, supra 83 F.2d at 881.
 
 
 74
 In summary, the injured shipper carries the burden of proving that cargo in good condition was delivered to the carrier and that the cargo arrived at the destination point in damaged condition. Once the shipper shows this, it has made out a prima facie case of liability against the carrier. The carrier then has the burden of proving either that it exercised due care in handling the cargo, that the damage resulted from an excepted cause under maritime law, or that the damage was excepted by contract. If the carrier proves one of these, then it has successfully rebutted the shipper's prima facie case. Unless the carrier proves absence of negligence, however, it has not reached a liability-free port. The carrier may still be liable if the shipper proves that negligence was a concurrent cause of the damage to the cargo. If the cargo owner succeeds in showing that negligence was a factor in the damage to the cargo, then the carrier will have the burden of proving the proper allocation of damages between the negligence and the excepted peril. Inability to do this will render the carrier liable for the total damage.
 
 
 75
 The majority are apparently unconvinced that the previous discussion represents an accurate description of the law. They further believe that placing the burden of proving due diligence on the carrier is in the interests of public policy, "(s)ince the carrier, and not the shipper, usually has the means of knowing most about the events of the voyage." Maj. op., Supra, at 143, 144. Superior knowledge of relevant facts is often raised as a consideration in allocating the burden of proof; it is, however, seldom the controlling factor. The consideration dwindles into even less significance in view of liberal discovery rules. See McCormick on Evidence 787 & n.19 (2d ed. 1972).
 
 
 76
 I believe that public policy considerations support the existing structure of the law by striking a reasonable balance of responsibilities between the shipper and the maritime common carrier. Reaching the proper balance in this seagoing conundrum has been the posture of the courts and the legislatures that have addressed the problem. See Wirth Limited v. SS Acadia Forest, 537 F.2d 1272, 1276-78 (5th Cir. 1976).
 
 
 77
 Early admiralty law designated common carriers by water as insurers of the goods they carried, liable for any and all damage unless occasioned by an act of God or the public enemy. See The Propeller Niagara v. Cordes, 62 U.S. 7, 23, 16 L.Ed. 41 (1858). In order to protect itself, a carrier would often include additional exceptions from liability in the bill of lading. These were recognized and upheld by the courts unless found contrary to public policy. See Liverpool & Great Western Steam Co. v. Phenix Insurance Co., 129 U.S. 397, 441, 9 S.Ct. 469, 32 L.Ed. 788 (1889). Clauses exempting the carrier from liability for negligence were generally not enforced, although this was not the case in all jurisdictions. Id. at 443-47, 9 S.Ct. 469. In 1893, Congress concluded that the scales had tipped too far in favor of the carriers and passed the Harter Act
 
 
 78
 (t)o meet the ever increasing attempts further to limit the liability of the vessel and her owner by inserting in bills of lading stipulations against losses arising from unseaworthiness, bad stowage, negligence, and other causes of liability by which the common-law responsibility of carriers by sea was being frittered away . . . .
 
 
 79
 The Willdomino, 300 F. 5, 9-10 (3d Cir. 1924), Aff'd 272 U.S. 718, 47 S.Ct. 261, 71 L.Ed. 491 (1927).
 
 
 80
 The Harter Act, as one might expect, was an accomplishment of compromise. The first section declared null and void contractual attempts to excuse carriers from liability for negligence in the care and custody of cargo. 46 U.S.C. § 190. The second section obligated the carrier to provide a seaworthy vessel or, at least, exercise due diligence in the effort to do so. 46 U.S.C. § 191. The seaworthy vessel requirement was a prerequisite to relief under the third section which exempted the carrier from liability for causes that were excepted under the common law or frequently appeared in bills of lading. 46 U.S.C. § 192; See 27 Tex.L.Rev. 525, 526-27 (1949).
 
 
 81
 In an effort to give greater specificity to the rules and to enhance international uniformity, Congress enacted the Carriage of Goods by Sea Act in 1936. 46 U.S.C. §§ 1300-1315. Although the act made some substantive changes in the law, it continued the policy of achieving a balance of responsibility between the shippers and common carriers. See Wirth Limited v. SS Acadia Forest, supra 537 F.2d at 1277-78; 27 Tex.L.Rev. 525, 528-30.
 
 
 82
 The allocation of the burden of proof adopted by the courts is consistent with the statutory scheme of achieving balance between the parties sought by the Harter Act and COGSA. The shipper need only show the delivery of cargo in good condition to the carrier and the discharge by the carrier of defective cargo. In the tradition of the common law responsibility of carriers of goods, the shipowner will be liable for the loss unless it can prove that the harm was the result of an excepted peril. Failing this, the carrier may still be excused from liability if it proves by a preponderance of the evidence that it exercised due diligence in the care and handling of the cargo. If the carrier shows that it is covered by one of the exceptions, however, it will not be saddled with the additional burden of proving due care. Instead, the burden of producing evidence on this issue rests with the party traditionally obligated affirmatively to prove negligence, the party complaining of the negligent misconduct. If the shipper succeeds in showing negligence, the burden of allocating the damages between the excepted cause and the negligence falls on the party who had control of the goods at all relevant times, the carrier. Thus, the peculiarities of admiralty law and the duties of carriers of goods mesh with traditional tort concepts to establish a fair division of responsibility for goods carried on water.
 
 B.
 
 83
 Even if the majority were to apply the burden of proof rules as set forth in part IA, Supra, it still may conclude that the district court judgment should be affirmed because Canal failed to show that the topping incident not only damaged the hull but also contaminated the cargo. A predicate to the shifting of the burden of proof to the cargo owner is proof that the cargo was damaged by an excepted cause, and, according to the majority, this was never accomplished. The majority reads the jury's verdict and responses to the interrogatories to mean that although damage to the barge was caused by an excepted peril, the contamination of the antifreeze resulted solely from the failure of Canal to properly care for the cargo after the incident. The majority states that "the trial judge necessarily implied that there was adequate evidence to support the jury's conclusion." Maj. op., Supra at 142.[3] The majority's failure to consider the propriety of this implication necessarily implies that it believes there is sufficient evidence to support the jury's conclusion. Although the majority's interpretation of the jury's findings may be understandable, I do not believe that the evidence on the record can support this result.
 
 
 84
 It is undisputed that the general verdict in favor of Canal established that the cracks and holes in the bottom of the barge occurred as a result of the topping incident at Lock 14, an excepted cause. PPG's position, and presumably that of the majority, is that although a peril of the sea caused the holes in the barge, the ingress of water was slow and the cargo could have been salvaged, but for Canal's negligence. Expert testimony established that the water-soluble antifreeze is heavier than water and would have leaked out of the holes in the barge. Although the leakage was slow, one must necessarily infer that it started immediately after the fractures appeared. Even if PPG's assertion concerning Canal's failure to salvage is true, once it is recognized that the water and antifreeze began mixing immediately after the rupture occurred, Canal has successfully shown that damage to the cargo resulted from an accepted peril and PPG has the burden of proving negligence.[4]
 
 
 85
 To determine what caused the damage to the cargo, one must focus on the factors that permitted the river water to enter the barge. "(T)he efficient cause of the damage sustained by the rice on board the Folmina must be sought in those conditions or events which caused or permitted the entrance of sea water." The Folmina, 212 U.S. 354, 362, 29 S.Ct. 363, 365, 53 L.Ed. 546 (1909). A similar case was before the Ninth Circuit in United States v. Los Angeles Soap, supra. A shipment of coconut oil was being transported from Manila to Los Angeles. During the voyage, the ship struck an obstruction in the water causing an undetected leak between the tanks containing coconut oil and fuel oil. The ship went into drydock and although the leak was discovered it was not repaired. In fact, the coconut oil remained in the hold mixing with the fuel oil for another two months until the cargo was delivered. The court's allocation of burden of proof was consistent with that described in the previous section:
 
 
 86
 The burden of bringing itself within the exception of the Harter Act by showing that the loss and damage were due in whole or in part to the stranding rests upon the (carrier). If it establishes that All of the shortage and contamination were the result of the stranding, the (carrier) is exempt from liability. If, on the other hand, the (carrier) can show only that Part of the loss is attributable to the stranding, And the (shipper) sustains its burden of proving that the (carrier) has been guilty of negligence in the care and custody of the cargo, the further burden of attributing the proper proportion of the entire damage to stranding on the one hand and its own negligence on the other rests upon the (carrier).
 
 
 87
 Id., 83 F.2d at 882 (emphasis supplied). In Los Angeles Soap, the cargo owner succeeded in proving the carrier's negligence.
 
 
 88
 The significance of the burden of proof in this case is particularly acute. Despite attempts by Canal to show that it acted diligently, the jury chose to reject this offer of proof and found that Canal did not satisfy the burden thrust upon it of proving due care. Had the burden been placed on PPG to establish negligence, however, the opposite result would have ineluctably ensued. The record is barren of any evidence demonstrating lack of due care on the part of Canal. Despite general allegations of Canal's failure to discover the damage to the barge and take steps to salvage the antifreeze, no evidence was presented to show that this could have been done. Reference has been made to "fleeting facilities" that appear between Lock 14 and St. Paul. Yet the evidence established that these would have been insufficient to allow proper inspection of the hull of the barge. In short, PPG failed to satisfy its burden of producing sufficient evidence to establish a jury question on the issue of negligence. Once the jury found that the holes in the barge resulted from an excepted peril, the district court should have entered the general verdict in favor of Canal and denied PPG's motion for judgment n.o.v.
 
 
 89
 It also appears that had the trial court recognized the proper allocation of burden of proof, the issue of negligence after the topping incident may never have gone to the jury. When conferring with counsel concerning the framing of interrogatories for the jury, the judge said, as I have already indicated, Supra n.3, that he strongly believed that there was no evidence on which the jury could decide that there was failure to exercise diligence and due care beyond the topping. He allowed the issue to go to the jury because he did not "want to finally decide" the question. Furthermore, in granting PPG's motion for judgment n. o. v., the court relied heavily on its determination that Canal had the burden of proof:
 
 
 90
 (E)ven if it be . . . assumed arguendo that plaintiff had offered no evidence upon which the jury could decide that there was a failure to exercise due diligence and due care beyond the topping, the interrogatory answers indicate that defendant's testimony was rejected by the jury. With The burden of persuasion resting on defendant Canal, the rejection of their evidence warrants a verdict for plaintiff in spite of any failure to affirmatively prove negligence. (Emphasis supplied.)
 
 
 91
 As the majority must recognize, this bouncing burden of proof renders this case not unlike a tennis match. The shipper has the serve and must put the ball in play by showing that the carrier had accepted good cargo but delivered it damaged. The carrier can return the serve by proving that the damage was caused by an excepted peril. Then, in order to keep the ball in play, the shipper must demonstrate that the damage to the cargo was at least in part attributable to negligence by the carrier. The carrier will lose the point unless it can show the apportionment of damages between the excepted cause and the negligence.
 
 
 92
 In this case, PPG served the ball in bounds by showing that the antifreeze was sound when loaded but contaminated by the time it reached St. Paul. Canal's return shot was proof that the contamination was caused by holes in the barge resulting from the topping incident. PPG, however, drove the ball into the net when it failed to produce any evidence of negligence on the part of Canal. Thus, the point, game, set, match, and judgment must be Canal's.
 
 II. OTHER ISSUES
 
 93
 Because PPG failed to produce any evidence of Canal's negligence, I believe the judgment of the district court should be reversed and judgment entered for the defendant. This renders consideration of the other contentions raised by Canal unnecessary. However, I would like simply to note my disagreement with two additional holdings of the majority.
 
 
 94
 The majority holds that the insurance provisions of the two contracts are unenforceable as a matter of public policy under the authority of Bisso v. Inland Waterways Corp., 349 U.S. 85, 75 S.Ct. 629, 99 L.Ed. 911 (1955). I believe that the distinction between the insurance clauses and Bisso made by the Fifth Circuit in Fluor Western, Inc. v. G & H Towing Co., 447 F.2d 35 (5th Cir. 1971), Cert. denied, 405 U.S. 922, 92 S.Ct. 959, 30 L.Ed.2d 793 (1972) and Twenty Grand Offshore, Inc. v. West India Carriers, Inc., 492 F.2d 679 (5th Cir.), Cert. denied, 419 U.S. 836, 95 S.Ct. 63, 42 L.Ed.2d 63 (1974), is correct and should be applied to this case.[5]
 
 
 95
 Furthermore, I disagree with the majority's conclusion that the single skin barge REB-1602 was seaworthy as a matter of law. A shipowner's obligation to provide a seaworthy vessel is substantial. See Mitchell v. Trawler Racer, Inc., 362 U.S. 539, 80 S.Ct. 926, 4 L.Ed.2d 941 (1960); The Plow City, 122 F.2d 816 (3d Cir. 1941). Seaworthiness is a relative concept that can vary depending on the type of cargo being transported. See Marshall v. Ove Skou Rederi A/S, 378 F.2d 193 (5th Cir.), Cert. denied, 389 U.S. 828, 88 S.Ct. 86, 19 L.Ed.2d 84 (1967); Schuylkill Transportation Co. v. Banks, 152 F.2d 405 (3d Cir. 1945). It is generally a question of fact for the jury, Mahnich v. Southern Steamship Co., 321 U.S. 96, 64 S.Ct. 455, 88 L.Ed. 561 (1944), and should be submitted to the jury if "fair minded men, viewing all the facts and the inferences to be drawn from the facts can differ over whether the ship and its gear are reasonably fit for service." Greene v. Vantage Steamship Corp., 466 F.2d 159, 162 (4th Cir. 1972).
 
 
 96
 In this case, Canal presented expert testimony suggesting that a single skin barge is unseaworthy for the purpose of carrying a liquid, soluble substance like antifreeze.[6] The witness also testified that the cargo would not have been contaminated if a double skin barge had been used. This is sufficient evidence to raise a jury question and it was error to decide the issue as a matter of law.
 
 
 97
 For the foregoing reasons, I respectfully dissent.
 
 
 
 *
 Honorable Clarkson S. Fisher, United States District Court for the District of New Jersey, sitting by designation
 
 
 [1]
 Diversity jurisdiction was invoked. Because of concurrent jurisdiction of the common law and admiralty under the Constitution, Art. III, § 2, and under act of Congress, 28 U.S.C. § 1331(1), this in personam action was properly brought in the district court and a jury trial was in order. See 1 Benedict on Admiralty §§ 106-107, 121-127 (7th ed. 1974); G. Gilmore & C. Black, The Law of Admiralty 19-31 (2d ed. 1975)
 
 
 [2]
 The interrogatories and answers were as follows:
 "1. If you determine that Canal has satisfied its burden of showing due diligence up to and including the topping incident at Lock 14, what percentage of the damage to the cargo occurred as a result of the topping, if any, and what percentage occurred from a failure of due care from the time of the topping to the arrival of the REB-1602 (Ashland barge) in St. Paul?
 Topping 0%
 After Topping 100%
 "2. Which of the parties, if any, failed to exercise due care from the time of the topping incident to the time of arrival in St. Paul?
 Defendant Canal
 Plaintiff, Defendant,
 Third-Party Defendant
 "3. What was the total amount of damage to the cargo?
 $110,000 00"
 
 
 [3]
 Paragraph 13 of the Canal-Ashland towing contract states:
 "13. The cargo shall be transported at the sole risk of such cargo, insofar as losses of or damage to such cargo is concerned, and neither Company A (Canal) nor any person employed by Company A, nor any vessel, barge or other equipment used hereunder, shall be liable for any loss of or damage to such cargo regardless of the causes of such loss or damage, provided only that Company A shall have exercised due diligence to make such vessel and other equipment seaworthy and properly manned, equipped and supplied, and provided that reasonable care shall have been exercised in the receipt, stowage, handling, care and delivery of the cargo which shall be in the possession of the tow from the time that the products reached the barge pipe or hose connection in loading until the products reached the shore line or hose connection in unloading. Company A although not a common carrier, shall be entitled to the same limitation of liability as common carriers receive under Section 3 of the Harbor (Sic) Act (46 U.S.C.A. § 192). Nothing in this contract shall be construed to . . . limit Company A's right to any statutory protection or limitation of liability, which would otherwise be applicable."
 Private carriers are not generally subject to the Harter Act unless specifically provided by agreement of the parties. See generally A. Knauth, The American Law of Ocean Bills of Lading 176-77 (4th ed. 1953).
 
 
 [4]
 Section 3 of the Harter Act provides in part pertinent here:
 "(N)either the vessel, her owner or owners, agent, or charterers, shall become or be held responsible for damage or loss resulting from faults or errors in navigation or in the management of said vessel nor shall the vessel . . . be held liable for losses arising from dangers of the sea or other navigable waters, acts of God, or public enemies, or the inherent defect, quality, or vice of the thing carried, or from insufficiency of package . . . ."
 
 
 [5]
 Essentially, the Harter Act and COGSA govern the rights and liabilities of carrier and cargo owner when goods transported under a bill of lading are damaged or lost. With certain exceptions, See, e. g., Gilmore & Black, Supra at 145-85, 153 n.50, the Harter Act and COGSA pose similar problems in burden of proof cases so that it is common practice to cite cases governed by the two interchangeably. See also Knauth, Supra at 163-69
 
 
 [6]
 The common law rule on burden of proof was carried forward under the Harter Act. Gilmore & Black, Supra at 141 n.8, 183
 
 
 [7]
 Schnell v. The Vallescura, supra, has often been cited in both "result" and "cause" kinds of cases for the proposition that there is a shifting burden of proof. See, e.g., cases listed in Vana Trading Co. v. S.S. Mette Skou, 556 F.2d 100, 104 n.7 (2d Cir. 1977). Indeed, although the Schnell opinion contains language applicable to both situations, it is itself a "result" case. Consequently there the shipper initially supplied direct evidence of negligence, rather than relying on a prima facie case
 
 
 [1]
 The majority opinion analyzes a dichotomy in the case law between "cause" and "result" cases, suggesting that while in a "result" case the burden of proof on the negligence issue may shift to the cargo owner, in a "cause" case it clearly remains with the carrier. Maj. op., Supra at 143-144. I believe this is a misunderstanding of the distinction between the two types of cases
 In both kinds of cases, the shipper establishes a prima facie case of liability by showing that the cargo was delivered to the carrier in good condition, but outturned at the destination damaged. The significance of the distinction between "result" and "cause" relates to what the carrier must prove before the burden shifts to the cargo owner to prove negligence. The question is answered by examining the exemptions from liability available to the carrier. These can be either statutory or incorporated by contract in the bill of lading.
 The bill of lading sometimes includes exemptions from liability for certain damaged conditions of the cargo, such as rust, breakage, or decay. This type of provision is advantageous to the carrier because if goods are outturned in damaged condition and it can show that it is an excepted condition, then the carrier has satisfied its burden and will not be liable absent proof of negligence. In the "result" case, the carrier need not prove the cause of the defective condition.
 Where the contract does not provide for an exemption from liability for goods delivered in certain damaged conditions, the carrier may still be relieved from liability by proving that the damage resulted from an excepted cause. The excepted causes may be available by contract or the relevant statutes. The difference between these cases and the "result" cases is that here it is necessary to prove the cause of the defective condition before the burden of proof on the negligence issue will shift to the cargo owner.
 If the carrier Fails to prove either an excepted cause or result, it can still be excused from liability if it carries the burden of proving the exercise of due diligence. In neither the "cause" nor "result" cases can the carrier exempt himself from liability for negligence. But once the carrier has proven either an excepted cause or an excepted result (depending on which exemptions are available), the burden will be on the cargo owner to prove the carrier's negligence. The significance of the difference in the two kinds of cases relates only to the nature of the exception claimed, and, thus, what the carrier must show in order to shift the burden. Determining whether an action is a "result" or "cause" case does not, as the majority suggests, dispose of the question of which party has the burden of proving negligence. See 27 Tex.L.Rev. 525 (1949).
 
 
 [2]
 I agree with the majority that although COGSA is not controlling in this case, the statute and the decisional law under it are applicable by analogy. See Maj. op., Supra at 142 n.5
 
 
 [3]
 This implication is contrary to the trial judge's statement to counsel following his supplementary instructions to the jury wherein he stated that "I feel very firmly that there isn't any evidence on which the jury could decide that there was failure to exercise due diligence and due care beyond the topping."
 
 
 [4]
 In a similar case, the Ninth Circuit dealt aptly with the significance of a small leak:
 (T)he appellant's contention that the leak was "insignificant" reminds one of Mercutio's grim comment regarding his mortal wound: "No, 't is not so deep as a well, nor so wide as a churchdoor, but 't is enough; 't will serve."
 United States v. Los Angeles Soap, supra 83 F.2d at 882.
 
 
 [5]
 I believe the distinction is sound and applicable to this case because here, unlike Bisso, (1) the shipper did not waive its right to recover its losses from any negligent party (recovery would still be allowed, E. g., if the insurer failed to pay); (2) the contract did not in itself provide for the waiver of any rights (right of subrogation would be waived only by subsequent insurance contract); and (3) the contract was not adhesive. As the Fifth Circuit observed:
 Under the circumstances of this case we must determine if the Bisso doctrine is so encompassing that in instances of fair dealing, with no anti-competitive forces at work, the parties to a towing contract cannot agree to include an insurance clause and thereby reduce the towing rate while not affecting the rights of the tug and barge Inter se, or eliminate the clause and accomplish the towing at a higher rate. We are of the view that Bisso contemplated no such expansive interpretation.
 Twenty Grand Offshore, Inc. v. West India Carriers, Inc., supra 492 F.2d at 683. I disagree with the majority's assertion, maj. op., Supra at 145, that the distinction only applies where the tower proves a reduction of its charges on that basis. I am also unconvinced that the insurance clause in the transportation agreement cannot be extended to a delegatee under the contract.
 
 
 [6]
 The expert testified that "valuable water soluble cargo such as ethylene glycol (antifreeze) should be carried only in double skin barges." The trial judge observed "even a layman such as I am would know if there's two layers, punctures in the outer layer wouldn't destroy the cargo."